1

2

3                                              O

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11   STELLA STEPHENS, AND      )   Case No. EDCV 09-01668
     TIMOTHY YOUNG, AS         )   VAP(DTBx)
12   INDIVIDUALS AND ON        )
     BEHALF OF ALL OTHER       )   **[Motion filed on January 22,**
13   SIMILARLY SITUATED,       )   **2010]**
                               )
14              Plaintiffs,    )   **ORDER GRANTING DEFENDANTS'**
                               )   **MOTION TO DISMISS FOR LACK**
15        v.                   )   **OF STANDING, WITH PREJUDICE,**
                               )   **AND DENYING DEFENDANTS'**
16   LENNAR CORPORATION;       )   **MOTION TO STRIKE AS MOOT**
     LENNAR HOMES OF           )
17   CALIFORNIA, INC.;         )
     UNIVERSAL MORTGAGE        )
18   COMPANY; EAGLE HOME       )
     MORTGAGE, INC.; AND DOES  )
19   1 THROUGH 10, INCLUSIVE,  )
                               )
20              Defendants.    )
     _____)

21

22

23        Defendants' Motions to Dismiss and to Strike came

24   before the Court for hearing on March 15, 2010.  After

25   reviewing and considering all papers filed in support of,

26   and in opposition to, the Motions, as well as the

27   arguments advanced by counsel at the hearing, the Court

28

                               1

GRANTS the Motion to Dismiss and DENIES the Motion to
Strike as moot.

## I.   BACKGROUND

**A.   Plaintiffs' Allegations**

Plaintiff Stella Stephens ("Stephens") alleges she
purchased a new residence in November 2005 in Riverside
County, California from Lennar Homes, paid cash for the
residence, and still owns and occupies the residence.
(First Amended Complaint ("FAC") ¶ 36.)  Stephens and
Lennar Homes executed a purchase contract and related
disclosure documents in May 2005.  (Motion ("Mot."),
Request for Judicial Notice ("RJN"), Exs. A & B.)

Plaintiff Timothy Young ("Young") alleges he
purchased a new residence in December 2006 in Riverside
County, California from Lennar Homes, made a down payment
of 45% of the total purchase price, and financed the
balance through Universal American Mortgage Company
("UAMC").  (FAC ¶ 37.)  Young and Lennar Homes executed a
purchase contract and related disclosure documents in
July 2006.  (Mot., RJN, Exs. C & D.)

Plaintiffs Stephens and Young (collectively,
"Plaintiffs") bring this putative class action on behalf
of themselves and a national class including "[a]ll
Lennar customers who purchased a new Lennar house from
January 1, 2004, through December 31, 2006, and put 20%

or more down toward the purchase of the house[,]" or
alternatively, "a class of new Lennar Corporation
customers whose homes are located in California."  (FAC
¶¶ 49-50.)

Plaintiffs allege "on information and belief" that
before 2004, Defendants Lennar Corporation, Lennar Homes
of California, and UAMC (collectively, "Defendants" or
"Lennar Defendants") implemented a "scheme" to increase
the number of houses sold and to increase the amount of
profit per sale.  (FAC ¶ 19.)  The "scheme" was intended
to "convince government entities, then the community, and
finally buyers that Defendants were building a
traditional neighborhood with stable owners who occupied
their homes and who were vested in the community and the
neighborhood."  (FAC ¶ 20.)  "Implicit in this marketing
scheme was that Defendants were making a good-faith
effort to sell homes to buyers who [Defendants] expected
could afford to buy the houses and would be stable
neighbors."  (Id.)

Plaintiffs allege that they were provided "marketing
materials that depicted the community as a stable,
family[-]based neighborhood."  (FAC ¶¶ 36, 37.)
Plaintiffs also allege "on information and belief" that

1    Defendants represented that Lennar Homes requires buyers
2    to occupy the houses and discourages speculation.  (FAC ¶
3    41.)

4

5       Plaintiffs allege Defendants engaged in a scheme to
6    market the houses to, and provide financing for,
7    "unqualified buyers who posed an abnormally high risk of
8    foreclosure . . . to increase both the number of sales
9    and the prices of the houses in same neighborhoods in
10   which Defendants were selling to traditionally qualified
11   and low-foreclosure- risk buyers."  (FAC ¶ 21.)
12   Plaintiffs generally allege that Defendants assisted and
13   encouraged the "unqualified" buyers to appear qualified.
14   (FAC ¶ 24.)

15

16      Plaintiffs assert that Defendants "concealed and
17   intentionally failed to disclose to prospective buyers .
18   . . that numerous houses in the neighborhoods were being
19   purchased by unqualified and high-foreclosure-risk
20   buyers, despite Defendants' knowledge that this could,
21   and likely would over time, have a material negative
22   effect on the value and desirability of the house and the
23   neighborhood."  (FAC ¶ 30.)  Plaintiffs allege Defendants
24   also failed to disclose that "they had sold houses, and
25   planned to sell houses in the future, to investors who
26   would not occupy the houses."  (FAC ¶ 45.)

27

28

                              4

1   Plaintiffs allege two theories of harm stemming from
2   Defendants' conduct.  First, Plaintiffs allege they "paid
3   inflated prices for their houses" as a result of
4   Defendants' failure to disclose that "Defendants had sold
5   houses . . . to unqualified and high-foreclosure-risk
6   buyers. . . [and] to investors who would not occupy the
7   houses."  (FAC ¶¶ 45, 48.)  Secondly, Plaintiffs allege
8   they suffered an injury years after purchasing their
9   houses when the real estate market declined and the
10  "unqualified" buyers defaulted on their loans and lost
11  their houses in foreclosure proceedings, which led to a
12  decline in the value of Plaintiffs' residences.  (FAC ¶¶
13  32, 48.)

14

15  **B.  Procedural History**

16  On September 3, 2009, Plaintiff Stephens filed a
17  putative class action against the Lennar Defendants and
18  Eagle Home Mortgage, Inc.  On the same day, Plaintiff's
19  counsel filed seven other similar class actions[1]

20  _____

21  [1] The Homebuilder Actions are:
    • Dodaro v. Standard Pacific Corp., et al., ED09-
22    CV1666-VAP (OPx)
    • Stephens, et al. v. Lennar Corp, et al., ED09-CV1668-
23    VAP (DTBx)
    • Lumalu et al. v. Richmond American Homes Corp., et
24    al., ED09-CV1669-VAP (OPx)
    • Oneto v. The Ryland Group, Inc., et al., ED09-CV1670-
25    VAP (DBTx)
    • Maya, et al. v. Centex Corp., et al., ED09-CV1671-VAP
26    (OPx)
    • Martinez, et al. v. D.R. Horton, et al., ED09-CV1672-
27    VAP (DBTx)
    • Nielson, et al. v. Shea Homes, Inc, et al., ED09-
28                                          (continued...)

5

("Homebuilder Actions") alleging that the homebuilder
defendants and their mortgage lending affiliates engaged
in conduct that "artificially inflated" the purchases
prices of plaintiffs' residences and eventually reduced
their value.

On October 23, 2009, the Lennar Defendants and Eagle
Home Mortgage, Inc. joined in a "Motion to Consolidate,"
which sought to consolidate the eight Homebuilder
Actions.  The Court denied the Motion to Consolidate.  On
November 18, 2009, the Homebuilder Actions were
transferred to this Court.  On December 21, 2009,
Plaintiff Stephens and a newly added plaintiff, Plaintiff
Young, filed the FAC, which removed Defendant Eagle Home
Mortgage, Inc. and added allegations regarding the
remaining three defendants, Lennar Corporation, Lennar
Home of California, Inc., and Universal American Mortgage
Company.  The substance of the claims remains unchanged.

Plaintiffs allege five claims: (1) fraud; (2)
negligent misrepresentation; (3) violation of
California's Unfair Business Practices Act, Cal. Bus. &
Prof. Code §§ 17200, _et seq._; (4) violation of Cal. Bus.

---

[1](...continued)
CV1673-VAP (DTBx)
• _Kelly, et al. v. Beazer Homes USA, Inc., et al.,_
ED09-CV1674-VAP (DTBx)

& Prof. Code §§ 17500, <u>et seq.</u>; and (5) breach of the implied covenant of good faith and fair dealing.

On January 22, 2010, Defendants filed: (1) a Motion to Dismiss the First Amended Complaint ("Motion"), (2) a Motion to Strike Portions of the First Amended Complaint, (3) the Declaration of Richard S. Ruben ("Ruben Decl.") (4) a Request for Judicial Notice, and (5) a Compendium of Unpublished and Out-of-State Opinions. On February 22, 2010, Plaintiffs filed Opposition[2] to both Motions. On March 4, 2010, Defendants filed a Reply for both Motions and a Request for Judicial Notice.

Defendants argue the FAC should be dismissed for the following reasons: (1) Plaintiffs lack constitutional standing to bring this action; (2) Plaintiffs fail to allege their fraud-based claims with particularity as required by Rule 9(b); (3) Plaintiffs fail to state a

_____

[2] Counsel for the plaintiffs in the eight Homebuilder Actions divides the subject matter of the Oppositions to Homebuilder Defendants' Motions as follows:

- <u>Stephens, et al. v. Lennar Corp, et al.</u>, ED09-CV1668-VAP (DTBx): Plaintiffs' Opposition addresses constitutional standing ("Stephens Opp'n").
- <u>Oneto v. The Ryland Group, Inc., et al.</u>, ED09-CV1670-VAP (DBTx): Plaintiffs' Opposition addresses Plaintiffs' UCL claims and claims for breach of the implied covenant of good faith and fair dealing ("Oneto Opp'n").
- <u>Nielson, et al. v. Shea Homes, Inc, et al.</u>, ED09-CV1673-VAP (DTBx): Plaintiffs' Opposition addresses Rule 9 ("Nielson Opp'n.").

1  claim as to each cause of action under 12(b)(6).  (Mot.

2  at 1-2.)

3

4  **II.  LEGAL STANDARD FOR MOTION TO DISMISS UNDER**

5  **RULE 12(b)(6)**

6  Rule 12(b)(6) allows a party to bring a motion to

7  dismiss for failure to state a claim upon which relief

8  can be granted.  As a general matter, the Federal Rules

9  require only that a plaintiff provide "'a short and plain

10  statement of the claim' that will give the defendant fair

11  notice of what the plaintiff's claim is and the grounds

12  upon which it rests."  <u>Conley v. Gibson</u>, 355 U.S. 41, 47

13  (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>Bell Atlantic</u>

14  <u>Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  In addition,

15  the Court must accept all material allegations in the

16  complaint -- as well as any reasonable inferences to be

17  drawn from them -- as true.  <u>See Doe v. United States</u>,

18  419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC Ecology v. U.S.</u>

19  <u>Dep't of Air Force</u>, 411 F.3d 1092, 1096 (9th Cir. 2005).

20

21  "While a complaint attacked by a Rule 12(b)(6)

22  motion to dismiss does not need detailed factual

23  allegations, a plaintiff's obligation to provide the

24  'grounds' of his 'entitlement to relief' requires more

25  than labels and conclusions, and a formulaic recitation

26  of the elements of a cause of action will not do."  <u>Bell</u>

27  <u>Atlantic</u>, 550 U.S. at 555 (citations omitted).  Rather,

28

1    the allegations in the complaint "must be enough to raise

2    a right to relief above the speculative level."   <u>Id</u>.

3

4        In other words, the allegations must be plausible on

5    the face of the complaint.   See <u>Ashcroft v. Iqbal</u>, 556

6    U.S. ___, 129 S. Ct. 1937, 1949 (2009).   "The

7    plausibility standard is not akin to a 'probability

8    requirement,' but it asks for more than a sheer

9    possibility that a defendant has acted unlawfully.   Where

10   a complaint pleads facts that are 'merely consistent

11   with' a defendant's liability, it stops short of the line

12   between possibility and plausibility of 'entitlement to

13   relief.'"   <u>Id.</u>   (citations and internal quotations

14   omitted).

15

16        Although the scope of review is limited to the

17   contents of the complaint, the Court may also consider

18   exhibits submitted with the complaint, <u>Hal Roach Studios,</u>

19   <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19

20   (9th Cir. 1990), and "take judicial notice of matters of

21   public record outside the pleadings," <u>Mir v. Little Co.</u>

22   <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

23

24        "Failure to properly allege standing is a ground for

25   dismissal under Rule 12(b)(6)."   <u>MAI Sys. Corp. v. UIPS</u>,

26   856 F. Supp. 538, 539 (N.D. Cal. 1994), citing <u>W. Mining</u>

27   <u>Council v. Watt</u>, 643 F.2d 618 (9th Cir. 1980).

28

1

**III.  DISCUSSION**

2      Article III of the Constitution gives federal courts
3 jurisdiction over "cases and controversies."  U.S. Const.
4 Art. III, § 2, cl. 2.  "In essence the question of
5 standing is whether the litigant is entitled to have the
6 court decide the merits of the dispute or of particular
7 issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).
8 Standing, therefore, is a threshold issue in every
9 federal case.  Elk Grove Unified Sch. Dist. v. Newdow,
10 524 U.S. 1, 11 (2004) ("In every federal case, the party
11 bringing the suit must establish standing to prosecute
12 the action."); Warth, 422 U.S. at 517-18;  McMichael v.
13 County of Napa, 709 F.2d 1268, 1269 (9th Cir. 1983)
14 ("Before the judicial process may be invoked, a plaintiff
15 must 'show that the facts alleged present the court with
16 a 'case or controversy' in the constitutional sense and
17 that [he] is a proper plaintiff to raise the issues
18 sought to be litigated.'"), citing Linda R.S. v. Richard
19 D., 410 U.S. 614, 616 (1973).

20

21      To satisfy the "case or controversy" requirement, a
22 plaintiff "must demonstrate that he has suffered an
23 'injury in fact'" that a favorable judgment will redress.
24 Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); Newdow,
25 542 U.S. at 12, citing Lujan v. Defenders of Wildlife,
26 504 U.S. 555, 560-561 (1992).  In other words, a
27 plaintiff must demonstrate: (1) he has suffered an

28

"'injury in fact' -- an invasion of a legally protected
interest which is (a) concrete and particularized, and
(b) actual or imminent, not conjectural or hypothetical";
(2) there is a causal connection between the injury and
the conduct complained of -- that is, the injury is
"fairly traceable" to the challenged action of the
defendant, and not the result of the independent action
of some third party not before the court; and (3) it is
"likely," as opposed to merely "speculative," that the
injury will be redressed by a favorable judicial
decision.  Lujan, 504 U.S. at 560-61 (footnote,
citations, and quotation marks omitted).

        The party invoking federal jurisdiction bears the
burden of establishing the elements of standing.  Lujan,
504 U.S. at 561, citing FW/PBS, Inc. v. Dallas, 493 U.S.
215, 231 (1990); Warth, 422 U.S. at 508.  As the three
elements of standing "are not mere pleading requirements
but rather an indispensable part of the plaintiff's case,
each element must be supported in the same way as any
other matter on which the plaintiff bears the burden of
proof, i.e., with the manner and degree of evidence
required at the successive stages in litigation."  Lujan,
504 U.S. at 561; Lujan v. Nat'l Wildlife Fed'n, 497 U.S.
871, 883-89 (1990); Gladstone Realtors v. Village of
Bellwood, 441 U.S. 91, 114-15 & n.31 (1979); Simon v. E.
Kentucky Welfare Rights Org., 426 U.S. 26, 45 & n.25

11

(1917); <u>Warth</u>, 422 U.S. at 527 & n.6).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ."  <u>Id.</u>, citing <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 889.

Plaintiffs must satisfy Article III standing requirements to assert each of their claims in federal court.  As Plaintiffs' claims all are founded upon the same alleged injuries, the Court's analysis applies to each of them.  Plaintiffs fail to establish standing because they have not pled an injury in fact and have not shown how their alleged injuries are "fairly traceable" to Defendants' alleged actions.

**A.  Injury in Fact**

Defendants first focus on whether Plaintiffs have suffered a "concrete and particularized, and actual or imminent" injury necessary to meet the first element of Article III standing.  <u>Lujan</u>, 504 U.S. at 560-61.  To satisfy the "injury in fact" requirement, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the [defendant's] conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."  <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-02 (1983) (citations omitted); <u>Lujan</u>, 504 U.S. at 560 ("[By injury in fact we mean] an

invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical'.").

As noted above, Plaintiffs allege they were injured by (1) paying "inflated" purchase prices for their houses as a result of the "buying frenzy" created because Defendants sold houses to "unqualified" buyers ("overpayment theory") (FAC ¶¶ 22, 33), and (2) suffering a reduction in the value of their properties caused by Defendants' wrongful acts and omissions ("reduced-value theory") (FAC ¶¶ 32, 48).  These alleged harms fall short of a concrete, particular, and actual injury.

**1.  Reduced-Value Theory**

The Court first considers Plaintiffs' reduced-value theory.  Plaintiffs still own their houses, so their assertions of loss are conjectural.  Any loss (or gain) -- presumably measured against the initial purchase price -- cannot be ascertained, nor measured, unless and until the owner sells the house.  See Phillips v. Frank, 295 F.2d 629, 632 (9th Cir. 1961) (recognizing that a gain or loss in real property cases is determined at the time of sale).

1    Moreover, the cause of any such loss cannot be
2  determined until that time as well.  In other words,
3  Plaintiffs have alleged only harm which, rather than
4  being specific and concrete, is general and tied so
5  closely to pervasive economic conditions and harms, that
6  it does not suffice as an allegation of direct injury.
7  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d
8  763, 770 (2d Cir. 1994) (recognizing that a number of
9  variables can affect real estate values).

10

11    Other courts have reached the same conclusion when
12  faced with nearly identical allegations.  See Kaing v.
13  Pulte Homes, Inc., No. 09-5057, 2010 WL 625365, at *5-6
14  (N.D. Cal. Feb. 18, 2010); Tingley v. Beazer Homes Corp.,
15  No. 07-176, 2008 WL 1902108, at *5, n.3 (W.D.N.C. April
16  25, 2008) ("harm is only realized if Plaintiffs sell
17  their home."); Green v. Beazer Homes Corp., No. 07-1098,
18  2007 WL 2688612, at *3 (D.S.C. Sept. 10, 2007)
19  (dismissing the action because "Plaintiff does not . . .
20  suggest that she or any of her other similarly 'injured'
21  neighbors have realized this decrease in value (e.g., as
22  a result of sale of the home).").

23

24    In Kaing, the district court found that a plaintiff
25  in a putative class action against defendant homebuilders
26  lacked standing to assert a theory "that she ha[d] been
27  injured because [the homebuilders'] lending practices
28

caused widespread foreclosures in her neighborhood,
[which had] driven down the value of her house."  2010 WL
625365, at *5.  There, the plaintiff alleged that the
defendants "marketed the neighborhoods as stable and
desirable neighborhoods, while becoming even more
aggressive in selling homes to unqualified and high-
foreclosure-risk buyers . . . ."  <u>Id.</u> at *2.  The
plaintiff alleged that high foreclosure rates in her
neighborhood decreased the value of her house by over
50%.  <u>Id.</u>

     Furthermore, the <u>Kaing</u> defendant homebuilders'
misconduct also allegedly "result[ed] in abandoned
houses; multiple families living in one home; transient
neighbors with no long-term ties to the neighborhood;
unfinished yards and unkempt yards; and, in some cases,
increased crime."  <u>Id.</u> at *5.  There, as here, the
plaintiff still owned her residence when she brought the
action.  <u>Id.</u> at *1-2.  Also like the Plaintiffs here, the
<u>Kaing</u> plaintiff alleged she was harmed by the homebuilder
defendants' failure to provide her with a disclosure that
"Defendants had sold houses, and would sell houses in the
future, to unqualified and high-foreclosure-risk buyers."
<u>Id.</u> at *2.

Distinguishing "general economic harms" from the harm in cases where a plaintiff's injury arose from a physical change to the neighborhood's environment, the <u>Kaing</u> court noted, "[A] decline in value that is tied to a purely economic change to a neighborhood is much more difficult to characterize as 'concrete and particularized, and actual or imminent.'  Such economic conditions are likely to change with the broader economy, and any decline in housing value can potentially evaporate before Plaintiff has suffered a concrete injury, even in the absence of redress from the courts."  <u>Id.</u> at *5, citing <u>Lujan</u>, 504 U.S. at 560-61.  As the plaintiff had not sold, or even attempted to sell, her house under the changed economic conditions, the court concluded, "[I]t is not clear that the diminished value of her house is cognizable as an 'injury in fact.'"  <u>Id.</u>

In reaching its conclusion, the <u>Kaing</u> court relied on two other cases arising under similar circumstances -- <u>Tingley</u> and <u>Green</u>.  In both cases, the plaintiffs filed putative class actions against defendant homebuilders, claiming the defendants targeted low-income purchasers, which resulted in high rates of foreclosure in plaintiffs' neighborhoods and consequently decreased the value of the plaintiffs' residences.  <u>See</u> <u>Tingley</u>, 2008 WL 1902108, at *1-2; <u>Green</u>, 2007 WL 2688612, at *2.

Although the <u>Tingley</u> court premised its holding on lack of causation rather than injury in fact, the court noted, "Since the reduced value about which Plaintiffs complain would have resulted from an economic glut of supply, then such harm is only realized if Plaintiffs sell their home during such glut.  If Plaintiffs chose to remain in their home until more favorable economic conditions arrive, then they will have realized no loss at all." <u>Tingley</u>, 2008 WL 1902108, at *5, n.3.

The <u>Green</u> court adopted similar reasoning, holding that although the plaintiff alleged an injury in the form of a generalized loss in the potential market value of her house due to excessive foreclosures on other houses in her neighborhood, she did not "suggest that she or any of her other similarly 'injured' neighbors [had] realized this decrease in value (<u>e.g.</u>, as a result of sale of the home)." <u>Green</u>, 2007 WL 2688612, at *3.  The court thus concluded that the plaintiff's injury was neither concrete nor particularized.  Furthermore, it reasoned, "the alleged cause of the decreased value (excessive foreclosures) is of a type which would not necessarily have a long term impact on home prices.  This strongly suggests that the injury is conjectural and speculative, and not actual or imminent." <u>Id.</u>, citing <u>Lujan</u>, 504 U.S. at 560-61.

1    Here, Plaintiffs have not sold their houses at a loss
2  or suffered any actual loss arising from the harms they
3  allege in the FAC.  (See FAC ¶¶ 36, 37.)  Thus, like the
4  plaintiffs in Kaing, Tingley, and Green, Plaintiffs have
5  not "realized [a] decrease in value."  Kaing, 2010 WL
6  625365, at *5; Tingley, 2008 WL 1902108, at *5 n.3;
7  Green, 2007 WL 2688612, at *3.  Furthermore, the injury
8  is speculative, rather than actual or imminent, because
9  economic conditions affecting the value of Plaintiffs'
10 houses are subject to change with broader economic
11 conditions.  Green, 2007 WL 2688612, at *3; Tingley, 2008
12 WL 1902108, at *4 ("it is just as plausible that a
13 positive change in the unemployment rate, the housing
14 market, the mortgage interest rates or other economic
15 factors could cause an increase in [Plaintiffs'] property
16 value[s].") (emphasis added).  Thus, the alleged decline
17 in value that Plaintiffs claim to have suffered may
18 vanish before Plaintiffs suffer a concrete injury.  See
19 Kaing, 2010 WL 625365, citing Lujan, 504 U.S. at 560-61.
20
21    To bolster their claim and distinguish the facts here
22 from Tingley and Green, Plaintiffs allege they suffered
23 additional injuries: "[U]nstable neighborhoods, multiple
24 families living in one home, transient neighbors with no
25 long-term ties to the neighborhood, unfinished and
26 unkempt yards, and in some cases, increased crime."  (See
27 Stephens Opp'n at 13.)  This attempt fails, however,
28

because Plaintiffs' FAC contains nothing more than
speculation to link these harms to Defendants' conduct or
omissions.  <u>See</u> <u>Kaing</u>, 2010 WL 625365, at *5-6 (holding
that plaintiffs claiming similar injuries failed to
allege a cognizable injury in fact).  <u>See</u> Section
III(A)2, below.

Plaintiffs also attempt to distinguish this case from
<u>Tingley</u> and <u>Green</u> by arguing that the plaintiffs in those
cases did not allege a failure to disclose or that the
prices of their houses were "artificially inflated" as a
result of the defendant homebuilders' conduct.  (Stephens
Opp'n at 13.)  The existence of an additional allegation
of harm, however, does not salvage the FAC.

Moreover, Plaintiffs fail to distinguish their case
from <u>Kaing</u>, in which the plaintiff claimed failure to
disclose and also alleged she was overcharged.  2010 WL
625365, at *2.  Plaintiffs fail to persuade the Court
that these factors are sufficient to transform their
speculative harms into a cognizable injury in fact.

Plaintiffs rely on <u>Friends of the Earth, Inc. v.
Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167 (2000), to
argue they have pled a cognizable injury in fact.
(Stephens Opp'n at 9-10.)  There, the Supreme Court
considered the ability to sue for environmental harm, and

held that a citizen adequately pled an injury in fact by alleging the defendant's pollution interfered with recreational opportunities.  528 U.S. at 183.  Plaintiffs point to language in the opinion referring  to an alleged diminution in the value of the litigants' property.  <u>Id.</u> at 182-83.  A diminution in value that is tied to a physical change in the neighborhood's environment, such as pollution in the case of <u>Friends of the Earth</u>, is better characterized as concrete and particularized, and actual or imminent, than a purely economic change in a neighborhood.  <u>Lujan</u>, 504 U.S. at 560-61.

When faced with similar facts, the district court in <u>Kaing</u> found the plaintiff had failed to plead actual injury.  2010 WL 625365, at *5 ("Compared to the diminution in value that is tied to a physical change to the neighborhood's environment, such as pollution . . . a decline in value that is tied to a purely economic change to a neighborhood is much more difficult to characterize as concrete and particularized, and actual or imminent.").  The <u>Kaing</u> court noted a key difference between environmental harm tied to physical damage and economic harm: "[A diminution in value arising from economic harm] can potentially evaporate before Plaintiff has suffered a concrete injury, even in the absence of redress from the courts."  <u>Id.</u>  While environmental damage caused by pollution does not redress itself, the

complex economic factors that affected the value of
Plaintiffs' residences can improve.  See Tingley,2008 WL
1902108, at *4 n.3.


The capacity for Plaintiffs' alleged injury to
fluctuate with changes in the economy, "strongly
suggests" that Plaintiffs' alleged injury is "conjectural
and speculative, not actual or imminent."  Green, 2007 WL
2688612, at *3; see Sanner v. Bd. of Trade of City of
Chicago, 62 F.3d 918, 924 (7th Cir. 1995) (finding
soybean farmers who refrained from selling their crops
due to a depressed market price lacked standing to sue
under Article III, while those who sold at the depressed
price enjoyed standing because "[t]he fact of a sale at
an allegedly depressed price establishes discernable
injury in a manner in which a failure to sell cannot."),
citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S.
723, 743 (1975).


Plaintiffs next argue they have suffered an injury in
fact because California law permits real estate buyers to
sue for rescission and damages when a seller fails to
disclose material facts.  (Stephens Opp'n at 10-11); see
Reed v. King, 145 Cal. App. 2d 261 (1983).  This argument
fails, however, because it merely states the remedies
available to plaintiffs in failure to disclose cases, but
does not establish an injury.

1    Furthermore, the facts in the cases Plaintiffs cite
2  are distinguishable from the context of this case; the
3  failure to disclose in the former cases recognized a duty
4  to disclose (1) physical defects and legal impediments to
5  use of real property, (<u>Karoutas v. HomeFed Bank</u>, 232 Cal.
6  App. 3d 767, 771 (1991) (finding a duty to disclose where
7  plaintiff's residence had substantial and permanent soil
8  movement that required costly repairs); <u>SanFran Co. v.</u>
9  <u>Rees Blow Pipe Mfg. Co.</u>, 168 Cal. App. 2d 191, 205
10 (finding a duty to disclose where a property was missing
11 walls and subject to various building code violations);
12 <u>Graf v. Sumpter</u>, 207 Cal. App. 2d 391, 392-93 (finding a
13 duty to disclose where the land upon which plaintiffs'
14 residence was built was not properly compacted, causing
15 cracking and crumbling of the residence); or (2) in cases
16 of extreme stigma, (<u>Reed v. King</u>, 145 Cal. App. 3d 261,
17 267 (1983) (finding a duty to disclose where residence
18 was site of gruesome multiple murders committed on the
19 property, but noting that such circumstances were "highly
20 unusual")).

21

22    **2.  Overpayment Theory**
23    Finally, as to Plaintiffs' overpayment theory, the
24 Court construes these allegations as an attempt to
25 describe Defendants' motives for issuing subprime loans.
26 To the extent, however, that Plaintiffs allege they
27 overpaid as a result of Defendants' efforts to inflate
28

housing demand artificially by offering subprime loans,
the Court finds the alleged injury is too speculative to
constitute an injury in fact because it is not "concrete
or verifiable."  See Kaing, 2010 WL 625365, at *3, n.2.
Plaintiffs allege that Defendants "market[ed] materials
that depicted the community as a stable, family[-]based
neighborhood" (FAC ¶¶ 36, 37) and "provided . . . false
and misleading standardized representations and
advertisements regarding the value of the house sold[,]
[t]he sales practice of selling to investors[,] and the
desirability of the neighborhood where the house was
sold" (FAC ¶ 73).  Plaintiffs also allege that Defendants
offered subprime loans to "artificially inflate[] demand"
and thereby increase prices for houses in Plaintiffs'
neighborhoods.  (FAC ¶¶ 21, 31, 33, 48, 66.)  As with
Plaintiffs' reduced-value theory, the capacity for
Plaintiffs' alleged injury to fluctuate with changes in
the economy, "strongly suggests" that Plaintiffs' injury
is "conjectural and speculative, not actual or imminent."
Green, 2007 WL 2688612, at *3.

    Thus, the Court finds that Plaintiffs have failed to
articulate an injury in fact that is "concrete and
particularized, and actual or imminent."  Cf. Lujan, 504
U.S. at 560-61.

23

**B.   Causation**

Plaintiffs "face[] a similarly insurmountable problem with respect to the causation element of standing." Kaing, 2010 WL 625365, at *6.  Plaintiffs allege they overpaid for their houses and suffered a reduction in the value of their properties caused by Defendants' wrongful acts and omissions.  Plaintiffs' injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  Lujan, 504 U.S. at 560. "The line of causation between the [alleged] illegal conduct and injury" must not be "too attenuated."  Allen v. Wright, 468 U.S. 737, 752 (1984).

**1.   Reduced-Value Theory**

Plaintiffs' reduced-value injury is not "fairly traceable" to the challenged action of Defendants. First, any loss in value Plaintiffs have suffered has resulted not just from the actions of Defendants, but also from the independent actions of others, e.g. homeowners in Plaintiffs' neighborhoods who defaulted on their mortgages and third-party mortgage companies that foreclosed on houses in Plaintiffs' neighborhoods. Plaintiffs' theory is premised upon a chain of causation that is affected by general economic factors.  These general factors can have unpredictable effects, such as collapse of financial institutions, changes in the credit

market, and rising unemployment, which by themselves or
in combination affect the housing market.  In other
words, any injuries suffered by Plaintiffs necessarily
depend upon a causal chain that includes numerous
independent forces and individual decisions of "some
third part[ies] not before the court."  Lujan, 504 U.S.
at 560-61.

    Plaintiffs allege that Defendants (1) "marketed the
house and neighborhood as stable and desirable" (FAC ¶¶
20, 29, 36-37); (2) sold houses to "unqualified and high-
foreclosure-risk buyers" and assisted them in purchasing
or financing their houses (FAC ¶¶ 21-22); (3) sold houses
to "investors that were not owner[-] occupiers of the
houses," (FAC ¶ 26); and (4) did not disclose this
information to Plaintiffs (FAC ¶ 29-30, 36-37, 45).
Plaintiffs conclude that as a result of Defendants'
conduct, the "neighborhoods where Plaintiffs live have
had a number of foreclosures," which "have resulted in
substantial loss of value to the surrounding homes."
(FAC ¶ 48.)

    As Defendants point out, an examination of the causal
chain reveals the speculative nature of Plaintiffs'
injuries.  (Mot. at 9.)  Plaintiffs allege that
Defendants sold houses in Plaintiffs' neighborhoods to
"unqualified" buyers.  Plaintiffs define as "unqualified"

those buyers who purchased their houses with less than a
20% down payment.  Later, some of these unqualified
buyers defaulted on their mortgage loans.  Eventually,
third-party mortgage companies foreclosed on those
houses; Defendants did not initiate these foreclosure
proceedings.  The loss of houses due to foreclosure --
along with other factors -- eventually contributed to a
decrease in the value of Plaintiffs' houses.  (See
Stephens Opp'n at 9.)  When examining the chain of events
Plaintiffs allege, it is apparent that the Plaintiffs'
alleged injuries necessarily depend upon a causal chain
that includes numerous independent forces and individual
decisions of "some third part[ies] not before the court."
Lujan, 504 U.S. at 560-61.

    Other courts have reached the same conclusion when
faced with nearly identical allegations.  See Kaing, 2010
WL 625365, at *6; Tingley, 2008 WL 1902108, at *4; Green,
2007 WL 2688612, at *3.  As the Kaing and Tingley courts
noted, a causal chain cannot be found or even inferred
from such allegations because each link in the chain may
be caused by factors other than Defendants' conduct.
Kaing, 2010 WL 625365, at *6; Tingley, 2008 WL 1902108,
at *4.  For example, the other owners may have defaulted
on their mortgages as a result of "other factors, such as
unemployment, health problems, a general weakening of the
economy, or other financial conditions."  Tingley, 2008

26

WL 1902108, at *4.   Furthermore, there are "intervening
decisions by the mortgage assignees to foreclose the
defaulted mortgages rather than to restructure the loans,
which may have been done for reasons totally apart from
the alleged fraud."   Id.

     The allegations that the depreciation of Plaintiffs'
property was caused by the foreclosures in their
neighborhood, "rather than as a result of a myriad of
other factors, such as rising unemployment in the region,
changes in the housing market, or other economic
conditions," falls short of the standard required to
plead causation.   Kaing, 2010 WL 625365, at *6.   Although
foreclosures can have an adverse impact on property
values, supply and demand are affected simultaneously by
a number of market factors.   See Tingley, 2008 WL
1902108, at *4.   Any combination of these factors may
have caused a reduction in Plaintiffs' property values.
See id.   Even assuming that the value of Plaintiffs'
property was affected adversely by foreclosures in their
neighborhoods, the connection "remains too tenuous to
provide standing."   Id.

     The additional injuries Plaintiffs allege in the FAC
-- "unstable neighborhoods, multiple families living in
one home, transient neighbors with no long-term ties to
the neighborhood, unfinished and unkempt yards, and in

some cases, increased crime" -- are not "fairly traceable" to the challenged action of Defendants. Viewing the allegations in FAC in the light most favorable to Plaintiffs, Plaintiffs fail to plead facts sufficient "to raise a right to relief above the speculative level."  Bell Atlantic, 550 U.S. at 555.  The FAC contains nothing more than speculation to link these harms to Defendants' conduct or omissions.  See Kaing, 2010 WL 625365, at *5-6 (holding that plaintiffs claiming similar injuries failed to allege causation sufficient to survive a motion to dismiss).

The fragility of the connection between Defendants' alleged conduct and the decreased value of Plaintiffs' houses is illuminated "with each additional link in the chain where the choices of others have an impact and make other scenarios at least as plausible as the one advanced by . . . Plaintiffs."  Id.  Put into concrete terms, because Plaintiffs still own their properties, a positive change in the unemployment rate, housing market, mortgage interest rates, or other economic factors could cause Plaintiffs' property values to increase, thus decreasing or obviating their alleged losses.  Again, other courts reached the same conclusion.  Tingley, 2008 WL 1902108, at *4; Green, 2007 WL 2688612, at *3.

## 2. Overpayment Theory

Turning to Plaintiffs' overpayment theory, the Court construes these allegations as an attempt to describe Defendants' motives for issuing subprime loans. To the extent, however, that Plaintiffs allege they overpaid for their houses as a result of Defendants' efforts to inflate housing demand artificially by offering subprime loans, the causal connection between the alleged overpayment and Defendants' "scheme" depends upon numerous independent factors and third parties not before the court. See Kaing, 2010 WL 625365, at *6.

The third parties include, for example, the alleged "unqualified" and "investment" buyers to whom Plaintiff also indirectly assign blame for the decrease in their property values. These third parties acted independently, e.g., to default on loan payments, to choose their tenants, or to maintain their properties, which in turn directly affect losses Plaintiffs allegedly suffered, thus making it impossible to trace those losses to Defendants' alleged misconduct.

Similarly, the "housing bubble," or inflation of housing prices, was a nationwide phenomenon, traceable to variables independent of Defendants' alleged scheme, such as lax regulatory enforcement, rates of unemployment, credit market developments, and general economic growth.

1  As with Plaintiffs' reduced-value theory, it cannot be
2  said that the inflated purchase prices Plaintiffs
3  allegedly paid are fairly traceable to Defendants'
4  alleged "scheme."
5
6     Thus, taking Plaintiffs' allegations as true, as the
7  Court must for these purposes, Plaintiffs' harm is not
8  "fairly traceable" to Defendants' alleged conduct.
9  Plaintiffs, therefore, do not have standing to sue for
10 paying an "inflated" purchase price for their houses or
11 for a subsequent reduction in value of their houses.
12 Hence, the Court lacks subject matter jurisdiction over
13 this action and accordingly DISMISSES the FAC,[3] with
14 prejudice.
15
16             **IV. CONCLUSION**
17     For the foregoing reasons, the Court GRANTS
18 Defendants' Motion to Dismiss.  As the Court finds that
19 Plaintiffs would be unable to amend their pleadings to
20 correct the deficiencies related to constitutional
21
22
23
24
25 _____
26    [3] As the Court finds Plaintiffs lack standing to
   assert their claims, it does not have jurisdiction over
27 this matter.  The Court, accordingly, does not reach
   Plaintiffs' and Defendants' arguments regarding Rule 9
28 and 12(b)(6) as to each claim.

standing, it dismisses the First Amended Complaint with prejudice.

The Court DENIES Defendants' Motion to Strike as moot.

**IT IS SO ORDERED.**

Dated: <u>March 31, 2010</u>   _____
                              VIRGINIA A. PHILLIPS
                              United States District Judge